Sean P. Buckley
**BUCKLEY & THEROUX, LLC**
A LIMITED LIABILITY COMPANY
932 STATE ROAD
PRINCETON, N.J. 08540
(609) 924-9099
Attorneys for Defendant
Imran Bhatti, M.D.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ------------------------------- : <br> ------------------------- : <br> SELVE MUSE-FREEMAN, as duly : <br> appointed guardian of LINDA : <br> MUSE : <br> : <br>       Plaintiff, : <br> : <br>   vs. : <br> : <br> : <br> ARMEN SIMONIAN, MD; MERCER : <br> GASTROENTEROLOGY, PC; IMRAN : <br> BHATTI, MD; XYZ CORPORATION; : <br> ELLEN WINTER; TRENTON : <br> ANESTHESIOLOGY ASSOCIATES; : <br> JOHN/JANE DOE 1-10 : <br> (fictitiously named unknown <br> physicians, nurses and/or <br> medical personnel who <br> participated in Linda Muse's <br> care); and CAPITAL HEALTH <br> SYSTEM | Civil Action 07-3638 (AET) <br> <br> CIVIL ACTION <br> Medical Malpractice <br> <br> <br> <br> **MEMORANDUM OF LAW IN OPPOSITION** <br> **TO PLAINTIFF'S MOTION IN LIMINE** <br> **TO PRECLUDE THE TESTIMONY OF F.** <br> **DANA FORTUNATO, M.D.** |

I.    INTRODUCTION

This office represents Defendant, Dr. Imran Bhatti, in
the above-captioned matter.  With regard to this matter,
Dr. Bhatti has retained F. Dana Fortunato, M.D., as an
expert in Pulmonary Medicine.  A true and accurate copy of
Dr. Fortunato's Curriculum Vitae is attached as Exhibit A.

Presently before Your Honor is Plaintiff's Motion in Limine to Preclude the Testimony of F. Dana Fortunato, M.D.   In short, Plaintiff argues that Dr. Fortunato's testimony is speculative and seeks to preclude Dr. Fortunato's testimony pursuant to Federal Rule of Evidence 702 and <u>Daubert v.</u> <u>Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). Plaintiff inaccurately argues that Dr. Fortunato's testimony is unreliable and contrary to medical evidence. Plaintiff also emptily argues that Dr. Fortunato's opinion is not entirely consistent with other medical professionals who have offered deposition testimony in this matter, which somehow makes Dr. Fortunato's testimony unreliable or speculative.   As discussed more fully below, Dr. Fortunato's opinions and testimony are not unreliable nor contrary to medical evidence; furthermore, contradictory expert testimony is not necessarily unreliable.   As such, Plaintiff's Motion is meritless and must be denied.

II.   <u>FACTUAL BACKGROUND</u>

Plaintiff alleges that Linda Muse was admitted to Capital Health System - Mercer Campus, under the care of Armen Simonian, M.D., complaining of nausea and vomiting on August 5, 2005.  On August 6, 2005, an ultrasound of Ms. Muse's gallbladder was obtained which demonstrated the possible presence of gallstones.  On August 8, 2005, Ms.

Muse underwent an Endoscopic Retrograde Cholangiopancreatography (ERCP) performed by Dr. Simonian. Dr. Imran Bhatti was the attending anesthesiologist and Elinor Winter was the CRNA for the ERCP performed on August 8, 2005. Plaintiff alleges that prior to the ERCP Ms. Muse was found to have significantly elevated blood pressure and was given medications to lower same. During the procedure, Ms. Muse experienced a drop in oxygen saturation and blood pressure, which defendants responded to by the administration of a chin lift and continued the ERCP. Ms. Muse subsequently suffered a respiratory event which resulted in a drop in pulse, and respiration rate, followed by respiratory failure and cardiopulmonary arrest. Plaintiff contends that as a result of Defendants' collective failures, Plaintiff suffered a respiratory arrest which resulted in brain damage.

On behalf of Defendant, Dr. Bhatti, F. Dana Fortunato, M.D., has authored an expert report setting forth an opinion that that Plaintiff's cardiopulmonary arrest was not secondary to a ventilatory arrest from obstructive lung disease, but that the events which occurred to Plaintiff "were secondary to a combination of cardiac and noncardiac pulmonary edema as a result of the cannulation of the pancreatic duct as well as a vasovagal reaction." See the

August 18, 2008 report of Dr. Fortunato which has been attached to Plaintiff's Memorandum of Law as Exhibit A.  In preparing the report, Dr. Fortunato relied on a myriad of sources outlined on the first and second page of said report, including, but not limited to: medical records, deposition transcripts, and expert reports.  Dr. Fortunato's report explains that the end-tidal $CO_2$ monitor was maintained at 38 during the procedure (even though it was not documented during the time of arrest, CRNA Winter testifies that the end-tidal $CO_2$ had not changed).  Id. Therefore, it is not possible that Ms. Muse had suffered a ventilatory arrest; just because the O2 saturation dropped to 50 does not mean that a ventilatory arrest occurred. Id.  With the end-tidal being maintained at a normal level of 38, drops in O2 saturation would occur as a result of ventilation perfusion abnormalities or due to shunting. Id.  Dr. Fortunato also states that it is well known that patients who undergo ERCPs can develop noncardiac pulmonary edema as a result of ERCPs when insufflation of the duodenum, as well as cannulation of the pancreatic duct occurs.  Id.  Dr. Fortunato explains that this insufflation can result in a vasovagal reaction and a bradycardia, or a noncardiac pulmonary edema, or an adult respiratory distress syndrome.  Id.  Noncardiac pulmonary edema would

quickly cause an O2 saturation to drop into the 50's from
the 90's as seen in Ms. Muse's case. Id. Furthermore, Ms.
Muse had multiple medical problems including diabetes
mellitus which predisposes her to a stiff diastolic
dysfunctioning heart that can develop "flash" pulmonary
edema as a result of changes in blood pressure or vasovagal
reactions. Id. Moreover, Dr. Fortunato explains that if
Ms. Muse had become hypoxic from ventilatory obstruction,
one would expect her heart rate to have increased initially
and not drop from the normal range to 30 as documented in
her case. Id. One would expect the heart rate to increase
transiently to levels well over 100 during episodes of
ventilatory obstruction or hypoxia, and then drop to the
bradycardic range as one normally sees; this did not occur
in Ms. Muse's case. Id. For Ms. Muse, there was an
immediate drop in her heart rate from normal to 30, and
hypoxia which immediately occurred at the same time
according to the records. Id.

III. LEGAL ANALYSIS

     As Plaintiff points out, expert testimony in the
Federal Courts is governed by Federal Rule of Evidence 702.
The rule is broadly phrased and the fields of knowledge
which may be drawn upon are not limited merely to the
"scientific" and "technical" but extend to all

"specialized" knowledge.  Similarly, the expert is viewed,
not in a narrow sense, but as a person qualified by
knowledge, skill, experience, training or education.
Federal Rule of Evidence 702 requires that expert testimony
be the product of reliable principles and methods that are
reliably applied to the facts of the case; nothing in
Federal Rule of Evidence 702 is intended to suggest that
experience alone, or experience in conjunction with other
knowledge, skill, training, or education may not prove to
be a sufficient foundation for expert testimony.  In fact,
Federal Rule of Evidence 702 contemplates that an expert
may be qualified on the basis of experience alone.  See
e.g., United States v. Jones, 107 F.3d 1147 (6th Cir. 1997);
Kumho Tire Co. v .Carmichael, 119 S. Ct. 1167, 1178 (1999).

In response to Daubert v. Merrell Dow Pharmaceuticals,
Inc., 509 U.S. 579 (1993) Federal Rule of Evidence 702 was
amended and trial judges were charged with the
responsibility to exclude unreliable expert testimony.
Daubert set forth a non-exclusive checklist for the courts
to use in assessing reliability of expert testimony:
whether the expert's technique or theory can be or has been
tested; whether the technique or theory has been subject to
peer review and publication; the known or potential rate of
error of the technique or theory when applied; the

existence and maintenance of standards and controls; and
whether the technique or theory has been generally accepted
in the scientific community. See generally Daubert, 509
U.S. 579. But see e.g., Kannankeril v. Terminix Int',
Inc., 128 F. 3d 802 (3d Cir. 1997) (holding that a lack of
peer review or publication was not dispositive of whether
the expert's opinion was supported by "widely accepted
scientific knowledge").

Other factors relevant in determining reliable expert
testimony have also been reported. For example, whether
experts are proposing to testify about matters growing
naturally and directly out of research they have conducted
independent of the litigation or whether they have
developed their opinions expressly for purposes of
testifying, see generally Daubert, 509 U.S. 579; whether
the expert has unjustifiably extrapolated from an accepted
premise to an unfounded conclusion, see General Elec. Co.
v. Joiner, 522 U.S. 136 (1997); whether the expert has
adequately accounted for obvious alternative explanations,
see Claar v. Burlington N.R.R., 29 F. 3d 499 (9th Cir.
1994); whether the expert is being as careful as he would
be in his regular professional work outside his paid
litigation consulting, see Sheehan v. Daily Racing Form,
Inc., 104 F.3d 940, 942 (7th Cir. 1997); and whether the

field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give, see Kumho Tire Co. v. Carmichael, 119 S. Ct. 1167, 1175 (1999).

Despite the trial court's role as a gatekeeper, rejection of expert testimony is the exception rather than the rule and Daubert did not intend the trial court's role to replace the adversarial system.  United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi, 80 F.3d 1074, 1078 (5th Cir. 1996).  As Daubert notes, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  509 U.S. at 595.  When a trial court rules that an expert's testimony is reliable, this does not mean that contradictory expert testimony is unreliable.  Federal Rule of Evidence 702 permits testimony that is the product of competing principles or methods in the same field of expertise.  Heller v. Shaw Industries, Inc., 167 F. 3d 146, 160 (3d Cir. 1999).  Obviously, proponents do not have to show to the judge that the opinions of their experts are correct; they only have to show that their opinions are reliable.  The evidentiary requirement of reliability is lower than the merits

standard of correctness.  In re Paoli R.R. Yard PCB

Litigation, 35 F.3d 717, 744 (3d Cir. 1994).  "Daubert

neither requires nor empowers trial courts to determine

which of several competing scientific theories has the best

provenance."  Ruiz-Troche v. Pepsi Cola, 161 F.3d 77, 85

(1st Cir. 1998).

Federal Rule of Evidence 702 calls for a quantitative

rather than qualitative analysis requiring expert testimony

be based on sufficient underlying "facts or data."  When

facts are in dispute, experts sometimes reach different

conclusions based on competing versions of the facts.  The

emphasis in Federal Rule of Evidence 702 on "sufficient

facts or data" is not intended to authorize a trial court

to exclude an expert's testimony on the ground that the

court believes one version of the facts and not the other.

Commentary on 2000 Amendment to Federal Rule of Evidence

702.  As such, the fact that Dr. Fortunato reaches an

opinion not held by other retained experts in this matter

is of no consequence.  The issue of whether any expert's

opinion is accepted is entirely up to the trier of fact.

Plaintiff argues that Dr. Fortunato's opinions are

unsupported by medical literature; this assertion is not

entirely accurate.  First, as discussed above, experience

alone, or experience in conjunction with other knowledge,

skill, training, or education may prove to be a sufficient
foundation for expert testimony.  Dr. Fortunato is Board
Certified in both Internal and Pulmonary Medicine and has
been a practicing physician for approximately thirty years.
Second, Dr. Fortunato's opinions are based upon a review of
the medical records, deposition testimony, and expert
reports.  When asked, Dr. Fortunato provided his opinion
that Plaintiff suffered a flash pulmonary edema; Dr.
Fortunato also provided the reasoning behind his opinion
based on the medical records.  See Plaintiff's Exhibit B at
26:17 - 27:18.  Dr. Fortunato was also asked to explain
flash pulmonary edema, which Plaintiff's counsel admits
there is literature to support.  Plaintiff's counsel argues
that Plaintiff's experts will testify that pulmonary edema
will manifest with clinical signs and will not just
disappear.  Counsel's assertion does not coincide with the
various experts' testimony as set forth below.  Again the
issue of which experts' opinion is believed to be true is
left to the trier of fact.  In any event, the beginning of
Dr. Fortunato's explanation is attached as part of
Plaintiff's Exhibit B in an attempt to discredit Dr.
Fortunato for making an assumption based on the medical
records.  See Plaintiff's Exhibit B at 43:3-23.
Plaintiff's counsel, however, failed to include the

entirety of Dr. Fortunato's explanation as well as
counsel's follow-up questions regarding where and how Dr.
Fortunato reached his opinions.  A true and accurate copy
of relevant portions of Dr. Fortunato's deposition
transcript has been attached as Exhibit B.  Plaintiff skips
over this pertinent information.  See Exhibit B at 43:5 -
54:17  Plaintiff then points to a specific, incomplete,
portion of testimony, taken out of context, to support a
position that there was nothing heard in Plaintiff's lungs
consistent with pulmonary edema.  See Plaintiff's Exhibit B
at 50:15-25.  Plaintiff argues that Dr. Fortunato supplies
no literature to support this opinion, but while Dr.
Fortunato agrees that there was nothing heard in the lungs
consistent with pulmonary edema, he goes on to explain that
in a case of flash, or transient, pulmonary edema, the
physicians would not necessarily hear anything in the lungs
or have any findings of pulmonary edema or congestive heart
failure on chest X-ray.  See Exhibit B at 23:19 -25:18;
50:20 - 51:11.  Plaintiff seems only to fault Dr. Fortunato
for believing that the line of reasoning in the doctors'
notes and diagnoses in the chart are incorrect.  See
Plaintiff's Exhibit B at 34:9-21.

Plaintiff's argument that Dr. Fortunato's opinions are
contrary to that of every other medical professional is of

no consequence, as described above.  However, to be
thorough, Plaintiff's contention is also inaccurate.  It
should also be noted that none of the testimony Plaintiff
cites has been issued by a specialist in Pulmonary
Medicine.  Plaintiff refers to the testimony of: Dr. Steven
Konstadt, Board Certified in Anesthesiology with a
certification in peri-operative Echocardiograpy; Dr.
Charles Goldberg, Board Certified in Internal Medicine and
Gastroenterology; Dr. Charles Maltz, Board Certified in
Emergency Medicine, Internal Medicine, and
Gastroenterology; Dr. Adam Elfant, Board Certified in
Internal Medicine and Gastroenterology; and Dr. Gerald
Lefever, Board Certified in Anesthesiology.

Plaintiff cites to the deposition testimony of
anesthesiologist, Dr. Steven Konstadt, who testified to the
absence of findings supporting a diagnosis of pulmonary
edema.  However, a reading of Dr. Konstadt's testimony
reveals that: hearing evidence of fluid in the lungs is one
indication of pulmonary edema; a normal echocardiogram is
not absolutely inconsistent with a diagnosis of cardiac
pulmonary edema; and pulmonary edema may be present despite
the absence of physical findings on chest X-ray.  See
Plaintiff's Exhibit C at 144:13 - 146:7.  Dr. Konstadt
testified that, in patients with pulmonary edema, one would

see pink frothy fluid.  Id. at 146:5-7.  However, as

pulmonologist, Dr. Fortunato, explained, frothy sputum is

an obvious diagnosis that is an end stage of the pulmonary

edema situation.  See Exhibit B at 44:19 - 45:15.  Dr.

Konstadt also testified that Dr. Bhatti's postoperative

note would not be consistent with a persistent pulmonary

edema; Dr. Konstadt was not asked, however, whether the

records would be consistent with a flash pulmonary edema.

See Plaintiff's Exhibit C at 146:14 - 147:2.

Plaintiff cites to the deposition of

gastroenterologist, Charles S. Goldberg, M.D., to support

the contention that there was an absence of any clinical

findings supporting a diagnosis of pulmonary edema.  Again,

Plaintiff's contention is inaccurate.  In fact, Dr.

Goldberg testified that the chart does contain a diagnosis

of pulmonary edema.  Dr. Goldberg testified that "in the

chart there's something called the BNT level that is a

measure of congestive heart failure.  It's an objective

measure of congestive heart failure.  Pulmonary edema is a

form of congestive heart failure.  So there's clearly

evidence of suggestive [sic] heart failure."  See

Plaintiff's Exhibit D at 71:4-15.  As Dr. Fortunato also

explained at deposition, congestive heart failure is the

same as cardiac pulmonary edema.  See Exhibit B at 29:11-

21.   Furthermore, Dr. Goldberg has submitted two expert
reports in this matter which agree with Dr. Fortunato's
evaluation of the facts of this case.   The first, dated
August 6, 2008, was served on August 15, 2008; and the
second, dated November 5, 2008, was served on November 14,
2008.   True and accurate copies of Dr. Goldberg's two
expert reports have been attached as Exhibit C and D,
respectively.   A reading of Dr. Goldberg's report reveals
Dr. Goldberg's opinion that "Ms. Muse-Freeman experience
[sic] bradycardia and hypotension leading to
cardiopulmonary arrest and hypoxia.   Bradycardia,
myocardial ischemia and vasovagal events are well known to
occur during all types of endoscopic procedures including
ERCP and not related to any negligence on the part of the
gastroenterologist or anesthesiologist."   See Exhibit C at
page 5.   Dr. Goldberg goes on to opine that "[i]n this
patient with a history of diabetes, hypertension,
cardiomegaly, and congestive heart failure, these primary
cardiac events are more likely."   Id.   After reading the
deposition of Dr. Konstadt, Dr. Goldberg supplemented his
August 6, 2008 expert report to include "Dr. Konstadt
accepts that the facts of the case are consistent with
primary bradycardia alone leading to reduced brain
profusion and subsequent hypoventilation.   This clearly

supports the contention in my original letter." See
Exhibit D.  Obviously, neither Dr. Goldberg or Dr. Konstadt
are at odds with Dr. Fortunato's opinions, as Plaintiff
would have the Court believe.

Plaintiff also cites to the deposition of
gastroenterologist, Charles Maltz, M.D., for support or the
same contention.  However, Dr. Maltz testified that he did
not see in the medical record those signs that one may or
may not see in the case of transient pulmonary edema.  See
Plaintiff's Exhibit E.  Dr. Maltz testified that: he did
not recall seeing a diagnosis of pulmonary edema in the
chart, while one may hear fluid in the lungs there was no
indication in the record that anyone did; and that the
uncommon occurrence of seeing pink frothy material was not
recorded.  Id. at 138:19 - 140:2.  Dr. Maltz stated that
the chest X-rays did not show findings typical for
pulmonary edema and that he could not recall the results of
the echocardiogram.  Id. at 140:3-18.  As established,
however, lung sounds and physical findings may not always
be present in cases of pulmonary edema.  Furthermore, Dr.
Maltz stated that he saw reference to pulmonary edema in an
expert report.  Id. at 138:14-18.  Experts may base their
opinions on any material made known to the expert if of a
type reasonably relied upon by experts in the particular

field, including other's expert reports. See Federal Rule
of Evidence 703.

Plaintiff also states that gastroenterologist, Adam
Elfant, M.D., believes that Plaintiff did not suffer from
pulmonary edema. However, Dr. Elfant's testimony, attached
as Plaintiff's Exhibit F, clearly shows that Dr. Elfant
recalled seeing pulmonary edema and congestive heart
failure as part of Plaintiff's medical history and that
pulmonary edema is part of congestive heart failure. See
Plaintiff's Exhibit F at 130:18 - 131:18. Not included in
Plaintiff's Exhibit F is Dr. Elfant's testimony concerning
the findings of pulmonary edema. A true and accurate copy
of relevant portions of Dr. Elfant's deposition testimony
is attached as Exhibit E. Dr. Elfant testified that he
focused his review on the first few days of Plaintiff's
hospitalization and while he did not see any physical
findings in the pre-arrest care, "in early congestive heart
failure, you may not have findings on physical
examination." See Exhibit E at 131:25 - 134:7.

Additionally, Plaintiff cites to the testimony of
anesthesiologist, Gerald Lefever, to support the contention
that pulmonary edema was not diagnosed. See Plaintiff's
Exhibit G. Again, however, Dr. Lefever testified that he
remembered some discussion about pulmonary edema, but that

he did not recall physical findings, such as the end stage
pink frothy sputum, that would suggest to him a diagnosis
of pulmonary edema. Id. at 125:16 - 126:11. Again, as
testified to by various experts, a physical examination may
not always reveal signs of pulmonary edema.

Plaintiff's argument that Dr. Fortunato's opinions are
based on facts not of record is also inaccurate. As
described above, Dr. Fortunato continually explained how
his opinions were based upon a review of Plaintiff's
medical record; specifically pointing to area's of
Plaintiff's chart. See e.g., Exhibit B at 45:16 - 46:7.
Furthermore, Plaintiff's own expert, James F. Noone, M.D.,
seems to testify that the medical records support Dr.
Fortunato's opinions. A true and accurate copy of relevant
portions of Dr. Noone's deposition transcript has been
attached as Exhibit F. Dr. Noone agrees that the
hypothesis that the sequence of events, hypoventilation on
to airway obstruction, is "entirely inconsistent" with the
medical records. See Exhibit F at 168:7-23; 179:20 -
180:9.

IV. CONCLUSION

Plaintiff does not challenge that Dr. Fortunato is
qualified to render an opinion as an expert nor does
Plaintiff challenge that Dr. Fortunato's testimony would be

"fit", that is of assistance to the trier of fact.
Plaintiff only argues that Dr. Fortunato's opinions are
unreliable.   However, Dr. Fortunato, as discussed above,
has based his opinion squarely upon the medical records and
his thirty years of experience in Pulmonary Medicine.
Contrary to Plaintiff's arguments, as demonstrated, Dr.
Fortunato's opinions are not unreliable, contrary to
medical evidence, or contrary to the opinion of every other
medical professional.   As such, Plaintiff's Motion to
preclude the testimony of Dr. Fortunato must be denied.

                              Respectfully submitted,

                              **Buckley & Theroux, LLC**
                              Attorneys for Defendant,
                              Imran Bhatti, M.D.


                    By: _Michael P. Opacki_____
                        Michael P. Opacki, Esq.


DATED:   January 26, 2009

Sean P. Buckley
**BUCKLEY & THEROUX, LLC**
A LIMITED LIABILITY COMPANY
932 STATE ROAD
PRINCETON, N.J. 08540
(609) 924-9099
Attorneys for Defendant
Imran Bhatti, M.D.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
----------------------------- :
------------------------    :  Civil Action 07-3638 (AET)
SELVE MUSE-FREEMAN, as duly  :
appointed guardian of LINDA  :
MUSE                         :            CIVIL ACTION
                             :         Medical Malpractice
        Plaintiff,           :
                             :
    vs.                      :
                             :
ARMEN SIMONIAN, MD; MERCER   :  CERTIFICATION OF FILING AND
GASTROENTEROLOGY, PC; IMRAN  :            SERVICE
BHATTI, MD; XYZ CORPORATION; :
ELLEN WINTER; TRENTON        :
ANESTHESIOLOGY ASSOCIATES;   :
JOHN/JANE DOE 1-10           :
(fictitiously named unknown
physicians, nurses and/or
medical personnel who
participated in Linda Muse's
care); and CAPITAL HEALTH
SYSTEM
```

I certify that one copy of the within Memorandum of

Law in Opposition to Plaintiff's Motion in Limine to

Preclude the Testimony of F. Dana Fortunato, M.D., and

Exhibits were filed electronically with the Clerk of The

United States District Court for the District of New Jersey

and one copy was sent via Regular Mail to:

Honorable Anne E. Thompson, United States Judge for the
District of New Jersey
United States District Court for the District of New Jersey
Clarkson S. Fisher Building & U.S. Courthoue
402 East State Street, Room 2020
Trenton, NJ 08608

Carol A. Shelly, Esq.
Mellon, Webster & Shelly
87 north Broad Street
Doylestown, PA 18901

Neal Schonhaut, Esq.
Archer & Greiner, P.C.
700 Alexander Park, Suite 102
Princeton, NJ 08540

Maura Waters Brady, Esq.
Vasios, Kelly & Strollo, P.A.
2444 Morris Avenue
Union, NJ 07083

Lora M. Foley, Esq.
Parker McCay, P.A.
Three Greentree Centre
7001 Lincoln Drive West
P.O. Box 974
Marlton, NJ 08053

Rudolph Socey, Esq.
Lenox, Socey, Wilgus, Formidoni, Brown, Giordano & Casey
3131 Princeton Pike
Lawrenceville, NJ 08648

Craig S. Combs, Esq.
Giblin & Combs
P.O. Box 1297
10 Madison Avenue
Morristown, NJ 07962

I hereby certify that the foregoing statements made by
me are true.   I am aware that if any of the foregoing
statements are willfully false, I am subject to punishment.

**Buckley & Theroux, LLC**
Attorneys for Defendant,
Imran Bhatti, M.D.


By: _Michael P. Opacki_
       Michael P. Opacki, Esq.


DATED:   January 26, 2009